Filed 7/19/21  Rockefeller Technology etc. v. Changzhou Sinotype etc. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROCKEFELLER TECHNOLOGY INVESTMENTS (ASIA) VII, | B272170 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS149995) |
| v. | |
| CHANGZHOU SINOTYPE TECHNOLOGY CO., LTD., | |
| Defendant and Appellant. | |

APPEAL on remand from the California Supreme Court, from an order of the Superior Court of Los Angeles County, Randolph Hammock, Judge.  Affirmed.

Law Offices of Steve Qi and Associates, Steve Qi and May T. To; Law Offices of Steven L. Sugars and Steven L. Sugars for Defendant and Appellant.

Paul Hastings, Thomas P. O'Brien, Katherine F. Murray, and Nicole D. Lueddeke; Blum Collins LLP, Steven A. Blum, and Gary Ho for Plaintiff and Respondent.

This appeal concerns an aborted international business deal between Changzhou SinoType Technology Co., Ltd. (SinoType), a Chinese company, and Rockefeller Technology Investments (Asia) VII (Rockefeller Asia), an American investment partnership.  When the relationship between the two entities soured, Rockefeller Asia pursued contractual arbitration against SinoType in Los Angeles.  SinoType did not appear or participate in the arbitration proceeding, and the arbitrator entered a default award in excess of $414 million against it.  The award was confirmed and judgment entered, again at a proceeding in which SinoType did not participate.

Approximately 15 months later, SinoType moved to set aside the judgment, asserting that it had never entered into a binding contract with Rockefeller Asia and had not agreed to contractual arbitration.[1]  The trial court denied the motion, finding, among other things, that SinoType had not acted with the requisite diligence.  SinoType appealed.

We affirm.  Pursuant to Code of Civil Procedure[2] section 473, a judgment may be set aside more than six months after it

---

[1]     SinoType also urged the judgment should be set aside because SinoType had not been served with the summons and petition to confirm the arbitration award in the manner required by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 (hereafter, Hague Service Convention).  This issue has been resolved by the California Supreme Court.  (See Factual and Procedural Background, Section (H), *post*.)

[2]     All subsequent undesignated statutory references are to the Code of Civil Procedure.

was entered only if it is *void*—that is, if the trial court acted without fundamental authority over the subject matter or a party. In the present case, the trial court had subject matter jurisdiction pursuant to section 1280 et seq., and it had personal jurisdiction over SinoType, a nonresident defendant, by virtue of SinoType's execution of a memorandum of understanding in which it specifically "submit[ted] to the jurisdiction of the Federal and State Courts in California." Accordingly, the judgment was not void, and the trial court properly denied the motion to set it aside.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.     *The Parties and the MOU*

SinoType is a Chinese company headquartered in Changzhou, China that develops and licenses Chinese fonts. Kejian (Curt) Huang (hereafter, Curt)[3], a citizen and resident of China, is SinoType's chairman and general manager.

Rockefeller Asia is an American investment partnership headquartered in New York. Faye Huang (hereafter, Faye) is Rockefeller Asia's president.

In 2007 and 2008, Curt and Faye met several times in Los Angeles to discuss forming a new company to market international fonts. On February 18, 2008, they signed a four-page Memorandum of Understanding (MOU), which stated that the parties intended to form a new company, known as World Wide Type (WWT). SinoType would receive an 87.5 percent interest in WWT "and shall contribute 100% of its interests in the

---

[3]     Because two principals share a last name (although they are not related to one another), for clarity we refer to them by their first names.

3

companies comprising Party A, i.e., Changzhou SinoType Technology." Rockefeller Asia would receive a 12.5 percent interest in WWT "and shall contribute 100% of its interests in the companies comprising Party B, i.e., Rockefeller Technology Investments (Asia) VII."

The MOU provided that "[t]he parties shall proceed with all deliberate speed, within 90 days if possible, to draft and to all execute long form agreements carrying forth the agreements made in this Agreement, together with any and all documents in furtherance of the agreements." It also provided that "[u]pon execution by the parties, this Agreement shall be in full force and effect and shall constitute the full understanding of the Parties that shall not be modified by any other agreements, oral or written."

The MOU contained several provisions governing potential disputes between the parties, as follows:

"6.    The Parties shall provide notice in the English language to each other at the addresses set forth in the Agreement via Federal Express or similar courier, with copies via facsimile or email, and shall be deemed received 3 business days after deposit with the courier.

"7.    The Parties hereby submit to the jurisdiction of the Federal and State courts in California and consent to service of process in accord with the notice provisions above.

"8.    In the event of any disputes arising between the Parties to this Agreement, either Party may submit the dispute to the Judicial Arbitration & Mediation Service in Los Angeles for exclusive and final resolution pursuant to according to [*sic*] its streamlined procedures before a single arbitrator . . . . Disputes

4

shall include failure of the Parties to come to Agreement as required by this Agreement in a timely fashion."

   B.   *The 2013 Arbitration*

The relationship between the parties soured, and the "long form agreements" were never finalized.  In February 2012, Rockefeller Asia filed a demand for arbitration with the Judicial Arbitration & Mediation Service (JAMS) in Los Angeles.  SinoType did not appear at the arbitration, which proceeded in its absence.

The arbitrator issued a final award on November 6, 2013.  He found as follows:

Rockefeller Asia is a special-purpose entity organized to provide capital to support technology companies in Asia.  Its partners include Rockefeller Fund Management Co., LLC.

In February 2008, SinoType and Rockefeller Asia entered into the MOU in which they agreed to form a new company (WWT).  Each party was to contribute its entire interest in its business to WWT.  In return, SinoType was to receive an 87.5 percent interest, and Rockefeller Asia was to receive a 12.5 percent interest, in WWT.  In 2008, Rockefeller Asia was funded with stock worth $9.65 million.

In 2010, the parties sought additional investors to buy a 10 percent interest in WWT.  The highest offer, obtained in May 2010, was for $60 million.  After receiving this offer, SinoType insisted that Rockefeller Asia agree to a reduction of its interest.  When Rockefeller Asia refused, SinoType unilaterally terminated the MOU.

Written proofs of service in the JAMS file, prepared and signed by JAMS Case Managers, confirm that SinoType was given written notice of all filings and hearings in the arbitration

5

proceeding, including submission of the demand for arbitration, commencement of the arbitration, appointment of the arbitrator, and notice of the hearing. Notices and copies of all materials were sent by both email and Federal Express to Curt Huang. Because SinoType did not appear, the arbitration proceeded under Article 27 of the JAMS International Rules, which authorizes an arbitrator to proceed by default where one party has failed to appear.

Rockefeller Asia's damages expert opined that Rockefeller Asia's damages included three components: loss of its 12.5 percent interest in WWT; loss of its control premium, which the expert valued at 10 percent of WWT's total value; and loss of its anti-dilution rights, which the expert valued at 6.25 percent of WWT's total value. Thus, Rockefeller Asia's damages were equal to 28.75 percent (12.5% + 10% + 6.25% = 28.75%) of WWT's value. The expert opined that WWT's value at the time SinoType terminated the MOU was $600 million, and therefore Rockefeller Asia's damages at termination were approximately $172 million ($600,000,000 x .2875 = $172,500,000). However, the expert opined that Rockefeller Asia's damages should be valued at the time of the arbitration, not the time of the termination. He estimated SinoType's value at the time of arbitration using "the 'wave' method . . . which assumes that [the company's] value has grown over the same interval at the same rate as other firms 'riding the same economic wave.' " The expert selected Apple Corporation as the "comparator firm," and estimated SinoType's current value by assuming a 240 percent increase between July 2010 and February 2012—i.e., the same increase that Apple experienced during a comparable period. The expert thus estimated Rockefeller Asia's damages to be $414 million, which

6

was "28.5% of the estimated total value of [SinoType] of $1.440 billion, using the wave method."

The Arbitrator "accept[ed] the evidence presented through [Rockefeller Asia's expert] concerning the percentage values of the control premium and the anti-dilution clause," and also "adopt[ed] [Rockefeller Asia's] proposal to set the date of valuation at February 2012." Based on the foregoing, the arbitrator awarded Rockefeller Asia $414,601,200.

C.      *Order Confirming the Arbitration Award*

Rockefeller Asia filed a petition to confirm the arbitration award. Subsequently, it filed a proof of service of summons, which declared that it had served SinoType in China by Federal Express on August 8, 2014, in accordance with the parties' agreement.

Following a hearing at which SinoType did not appear, on October 23, 2014, the trial court confirmed the arbitration award and entered judgment for Rockefeller Asia in the amount of $414,601,200, plus interest of 10 percent from November 6, 2013.

D.      *SinoType's Motion to Set Aside the Judgment*

On January 29, 2016, SinoType filed a motion pursuant to section 473 to set aside the judgment and to quash service of the summons. SinoType asserted that the order confirming the arbitration award and resulting judgment should be set aside because SinoType had not been validly served with the summons and petition to confirm the award pursuant to the Hague Service Convention, SinoType did not intend to waive service by signing the MOU, and SinoType's signature on the MOU was obtained by fraud. In support, SinoType submitted the declaration of Curt Huang, which stated in relevant part as follows:

7

Curt met Faye in 2007. Faye introduced herself as the CEO of Rockefeller Pacific Ventures Company and offered to introduce Curt to Nicholas Rockefeller (Rockefeller), who Faye said might be interested in investing in a project. Curt met with Rockefeller in July 2007 and discussed forming a new company that would develop software with fonts in many different alphabets and languages. Rockefeller expressed interest in the project. However, "[t]he name of the Rockefeller entity which Nicholas Rockefeller proposed to do business with SinoType changed on several occasions" and Curt "grew increasingly uncomfortable about the lack of clarity as to which company Nicholas Rockefeller proposed to do business with SinoType."

The parties met several more times in 2007 and 2008, but they did not make significant progress in consummating a deal. In February 2008, Faye offered to prepare a document referred to in Chinese as a "bei wang lu." According to Curt, a "bei wang lu" is a memorandum of understanding between parties that records the current state of negotiations; it "does not necessarily reflect terms to which the parties have agreed" and "is often used where there has been no real progress in a business meeting to memorialize the discussion so that the parties can pick up on the negotiations at a later meeting." The signing of a "bei wang lu" "does not create a binding contract." In contrast, Curt said, there are three other kinds of Chinese agreements: a "yi xiang shu" is "a letter of intent and reflects the intentions of the parties to enter into an agreement before a formal contract exists;" a "xie yi" is an agreement "which is usually, but not always legally binding;" and a "he tong" is "a formal contract, which is legally enforceable."

8

In February 2008, Faye presented Curt with a draft "bei wang lu."  Curt said he had only about 10 minutes to review the document "[b]ecause he had a flight to catch," but he told Faye that many of the proposed terms were unacceptable, including the designation of "Party B" as Rockefeller Asia (an entity Curt said he had never heard of), the anti-dilution protections for Rockefeller Asia, and the failure to indicate the amount of Rockefeller Asia's proposed contribution to the project. Curt was reluctant to sign the document, but was convinced to do so by Faye's assurances that the terms would be modified in a long-form agreement (or "xie yi") that would be drafted within 90 days.  Curt ultimately signed the document "because I knew it was not a binding document and I wanted to see progress on the deal.  I felt the MOU would push Rockefeller to draft the long form agreement within 90 days."

When he signed the MOU, Curt "had no intention to waive SinoType's right to service of process or [to] agree[] to arbitration. Because I only had ten minutes to review the MOU, I did not even know that it contained a statement saying SinoType would agree to alternate service.  I believed that the 'bei wang lu' had no legal implications and all of the terms would be negotiated and modified later in the actual contract."

In June 2010, Faye emailed Curt a draft Stock Purchase Agreement and other ancillary agreements.  The draft "was not something to which [Curt] could or would ever agree."  Curt told Faye he would not sign the draft documents.  Communications between the parties ended in March 2011.

Curt received a letter at the end of January 2012 that referenced arbitration.  He did not believe he had to respond to the letter because it was not a court document.  He received

subsequent FedEx packages and emails from Rockefeller, but he did not open them.

In March 2015, Curt heard from a client that Rockefeller Asia was alleging that SinoType owed it money. He then sought the advice of counsel, who opened the FedEx packages. That was when Curt learned an arbitrator had awarded Rockefeller Asia more than $414 million, which Curt said was more than 70 times SinoType's total revenue for the entire period from 2009 to 2013.

### E. Rockefeller Asia's Opposition to Motion to Set Aside the Judgment

Rockefeller Asia opposed SinoType's motion to set aside the judgment, urging that the motion was untimely; the 2008 MOU was valid and enforceable; and the summons and petition to confirm the arbitration award had been properly served. In support of its opposition, Rockefeller Asia submitted Faye Huang's declaration, which stated in relevant part as follows:

By the end of 2007, Rockefeller Asia and SinoType had decided to enter into a formal arrangement. On February 18, 2008, Faye and Curt executed the MOU. "At no point did I represent to Curt in either the English or the Mandarin Chinese language that the 2008 Agreement would not be considered an enforceable agreement . . . . There would be no purpose for Curt and me to sign the 2008 Agreement if that document was to be considered a nullity. At no point did Curt state that he disagreed with a single term in the [MOU] or inform me that the . . . provisions were not exactly as we had agreed."

Upon the signing of the MOU, "an Assignment of Partnership Interests was executed by the Rockefeller Parties pursuant to which they transferred their partnership interest,

10

which had a value of $9.65 million, to SinoType per the terms of the [MOU].”

Faye declared that “Curt and I intended the [MOU] to be effective and binding immediately, as its term provided that it could be modified only in a writing signed by both parties. However, we also anticipated that, while the short-form agreement would suffice for our mutual needs, a long-form agreement that would satisfy the very strenuous and impersonal requirements of the international investment community would be necessary to attract additional institutional investors in the future. Therefore, the [MOU] called for the parties to try to have the long-form agreement available ‘with all deliberate speed,’ within 90 days if possible.” However, the 90-day guideline for preparing the long-form documents “proved impossible.” Due to the 2008 recession, no third-party financing was on the horizon, and thus “the parties continued to operate under the binding 2008 Agreement.” Throughout this time, Rockefeller Asia “continued to perform and to supply tangible and intangible resources to SinoType.”

According to Faye’s declaration, SinoType survived the economic downturn in large part because of Rockefeller Asia’s efforts, and by 2009 SinoType’s internal evaluation showed that its then-current value approached $500 million and would increase in five years to almost $2 billion. Ultimately, however, the relationship between the companies began to deteriorate, and in July 2010, SinoType informed Rockefeller Asia that it had abrogated the MOU and Rockefeller Asia no longer owned a 12.5 percent interest in SinoType. Further, Curt told Faye that as a Chinese company, SinoType was immune to American legal

11

remedies and would refuse to participate in any legal process in the United States.

F.    *Order Denying Motion to Set Aside Judgment*

On April 15, 2016, the trial court denied the motion to set aside the judgment.  The court found that service by Federal Express was permitted by the MOU, which the arbitrator had found to be a binding contract.  Further, although the court found that Rockefeller Asia had not properly served SinoType under the Hague Service Convention, it concluded that the parties were permitted to contract around the Convention's service requirements.  Finally, the court said, "assuming for the sake of argument that somehow [Rockefeller Asia] was actually required to serve the Summons and Petition in this action upon [SinoType] in the manner suggested by [SinoType] (to wit, vis-a-vis the protocols established by the Chinese government), once [SinoType] was 'served' with the Summons and Petition in the manner which actually occurred in this case it had an obligation do something – to do exactly what it is doing now – to specially appear and to file a motion to quash.  This is what is called acting with 'diligence.' . . .  [¶]  The law is well settled that if a party is seeking to obtain relief from this court's equitable powers, it must act with reasonable diligence.  [Citations.]  Thus, to the extent that [SinoType] is also seeking to have this court exercise its broad equitable powers to grant the requested relief, under the totality of the circumstances it respectfully declines to grant such equitable relief due to the lack of reasonable diligence by the defendant in seeking relief . . . ."

G.    *Appeal*

SinoType timely appealed from the order denying the motion to set aside the judgment.  In an opinion issued June 1,

12

2018, this court found that Sinotype had not been validly served with process under the Hague Service Convention, and thus the trial court did not have personal jurisdiction over Sinotype. We therefore held the judgment against Sinotype was void as violating fundamental due process. (*Rockefeller Technology Investments (Asia) VII v. Changzhou Sinotype Technology Co., Ltd.* (2018) 24 Cal.App.5th 115, review granted Sept. 26, 2018, S249923.)

  H. *California Supreme Court Decision*

  The California Supreme Court granted review of our decision and, on April 2, 2020, reversed it. (*Rockefeller Technology Investments (Asia) VII v. Changzhou Sinotype Technology Co., Ltd.* (2020) 9 Cal.5th 125 (*Rockefeller*).) The high court explained that service of process performs two important functions: It asserts jurisdiction over the person of the defendant, and it gives notice to the defendant of the proceeding against it. (*Id.* at p. 139.) A party may waive both the personal jurisdiction and notice aspects of service by agreeing in advance to submit to the jurisdiction of a given court and to permit notice to be served by the opposing party. (*Id.* at pp. 139—140.)

  The court held that in the present case, the parties waived both aspects of service by entering into the MOU. It noted with regard to personal jurisdiction that paragraph 7 of the MOU "expressly stated '[t]he Parties hereby submit to the jurisdiction of the Federal and State Courts in California,' " and in paragraph 8, "the parties agreed to submit all disputes 'to the Judicial Arbitration & Mediation Service in Los Angeles for exclusive and final resolution . . . pursuant to California law . . . .' " Thus, the court said, because section 1293 gives California courts personal and subject matter jurisdiction to

13

enforce arbitration agreements formed in California, "[t]he parties' agreement to exclusively arbitrate any disputes in California constituted consent to submit to the jurisdiction of California courts to enforce that agreement, including 'by entering of judgment on an award under the agreement.' (§ 1293.)" (*Rockefeller*, *supra*, 9 Cal.5th at p. 143.)

With respect to notice, the court observed that the MOU specifically provided for notice to be provided at the addresses set forth in the MOU via Federal Express or similar courier. (*Rockefeller*, *supra*, 9 Cal.5th at p. 143.) Accordingly, because the parties agreed to waive formal service of process under California law in favor of informal notification, " 'this case does not present an occasion to transmit a judicial document for service abroad within the meaning of Article 1' of the Hague Service Convention." (*Id.* at p. 145.)

The court concluded: "Our conclusions as to California law are narrow. When parties agree to California arbitration, they consent to submit to the personal jurisdiction of California courts to enforce the agreement and any judgment under section 1293. When the agreement also specifies the manner in which the parties 'shall be served,' consistent with section 1290.4, subdivision (a), that agreement supplants statutory service requirements and constitutes a waiver of formal service in favor of the agreed-upon method of notification." (*Rockefeller*, *supra*, 9 Cal.5th at pp. 144—145.) The court therefore reversed the judgment of this court and remanded "for the resolution of unadjudicated issues." (*Id.* at p. 146.)

## DISCUSSION

SinoType contends on remand that the trial court erred by denying the motion to vacate the judgment because (1) the MOU

14

was not, facially, a binding agreement; (2) Faye fraudulently induced Curt to sign the MOU by representing that it was not a binding agreement; (3) the MOU was not supported by adequate consideration; and (4) the waiver of formal service was vague and was not labeled as a waiver. As we now discuss, SinoType did not timely raise these objections to the judgment, and thus the trial court was without power to consider them. The trial court therefore properly denied SinoType's motion to vacate the judgment.

## I.

## Standard of Review

We review the order denying SinoType's motion to set aside the judgment for an abuse of discretion. (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 940; *County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1225.) " ' "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' [Citation.] The scope of the trial court's discretion is limited by law governing the subject of the action taken. [Citation.] An action that transgresses the bounds of the applicable legal principles is deemed an abuse of discretion. [Citation.] In applying the abuse of discretion standard, we determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions. [Citation.]" (*In re Marriage of Drake* (2015) 241 Cal.App.4th 934, 939–940.)

## II.

## The Trial Court Did Not Abuse Its Discretion by
## Denying SinoType's Motion for Relief from Judgment

SinoType sought relief from the judgment pursuant to section 473. Two provisions of section 473 are relevant to our analysis. First, section 473, subdivision (b) provides that a court may relieve a party "from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." An application for relief under this section must be made "*within a reasonable time, in no case exceeding six months*, after the judgment, dismissal, order, or proceeding was taken." (§ 473, subd. (b), italics added.) Second, section 473, subdivision (d) provides that a court may, on motion of either party after notice to the other party, "set aside any *void judgment or order*." (Italics added.) A void judgment is vulnerable to direct or collateral attack " ' "at any time." ' " (*Strathvale Holdings v. E.B.H.* (2005) 126 Cal.App.4th 1241, 1249, quoting *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660.)

In the present case, SinoType filed the motion to vacate the judgment on January 29, 2016, more than 15 months after the trial court entered judgment on the arbitration award. Because the motion thus was not made within six months of entry of judgment, relief was available, if at all, only under section 473, subdivision (d)—i.e., if the judgment was *void*. (See, e.g., *Lee v. An* (2008) 168 Cal.App.4th 558, 563 [" 'A trial court has no statutory power under section 473, subdivision (d) to set aside a judgment that is not void' "]; *Cruz v. Fagor America, Inc.* (2007) 146 Cal.App.4th 488, 495–496.)

16

A judgment is void only if the court acts without "fundamental authority over the *subject matter, question presented, or party*." (*In re Marriage of Goddard* (2004) 33 Cal.4th 49, 56 (*Goddard*); see also *People v. Financial Casualty & Surety, Inc.* (2021) 64 Cal.App.5th 405, 414; *Calvert v. Al Binali* (2018) 29 Cal.App.5th 954, 961 [same].) In contrast, if the court has fundamental jurisdiction over the parties and subject matter, but acts in excess of its jurisdiction, the judgment is voidable, not void. (*Goddard*, at p. 56; *Vitatech Internat., Inc. v. Sporn* (2017) 16 Cal.App.5th 796, 807.)

SinoType appears to concede that the trial court had subject matter jurisdiction over the petition to confirm the arbitration award—a necessary concession in view of California's express statutory scheme for confirming arbitration awards. (See §§ 1280−1294.) SinoType contends, however, that the trial court lacked *personal jurisdiction* over it, a non-resident defendant, because the MOU (which provided that the parties were submitting to jurisdiction in California) is not, on its face, a binding agreement, and Faye fraudulently induced Curt to enter the MOU by representing that it was non-binding.

Whether the trial court had personal jurisdiction over SinoType is not properly before this court because the Supreme Court has already resolved the issue in favor of Rockefeller Asia. In its recent decision, the high court said as follows: "With respect to personal jurisdiction, paragraph 7 of the MOU expressly stated '[t]he Parties hereby submit to the jurisdiction of the Federal and State courts in California . . . .' Further, in paragraph 8, the parties agreed to submit all disputes 'to the Judicial Arbitration & Mediation Service in Los Angeles for exclusive and final resolution . . . pursuant to California law . . . .'

17

'Code of Civil Procedure section 1293 . . . gives California courts personal and subject matter jurisdiction to enforce arbitration agreements formed in California.' [Citation.] *The parties' agreement to exclusively arbitrate any disputes in California constituted consent to submit to the jurisdiction of California courts to enforce that agreement, including 'by entering of judgment on an award under the agreement.'* (§ 1293.)" (*Rockefeller*, *supra*, 9 Cal.5th at p. 143, italics added.)

SinoType urges us to look behind the Supreme Court's conclusion concerning personal jurisdiction, contending that Curt's signature on the MOU should not be construed as an agreement to submit to the jurisdiction of the California courts because the MOU was not, on its face, a binding agreement, and Faye fraudulently induced Curt to enter into the MOU by representing that the agreement was non-binding.  Because our Supreme Court has already spoken on this issue, we are without authority to revisit it.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  But even were this issue properly before us, we necessarily would reject it.  In circumstances like the present one, where a party claims that a contract containing an arbitration agreement is invalid, courts frequently have had to consider *who*—a court or an arbitrator—should decide the issue.  In analyzing this issue, our Supreme Court has held that parties to an arbitration agreement are presumed to have intended to have an arbitrator, not a court, decide allegations of fraud in the "inducement" of an agreement—that is, claims that a party " ' "knows what he is signing but his consent is *induced* by fraud." ' " (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415, 417 (*Rosenthal*).)  Only if a party claims fraud in the "execution" of an agreement—that is, that the

18

party "[was] deceived as to the nature of his act, and actually [did] not know what he [was] signing, or [did] not intend to enter into a contract at all, [such that] mutual assent is lacking"—may the dispute be resolved, in some circumstances, by a court. (*Id.* at pp. 415, 417.)

Even where a party claims that an agreement containing an arbitration provision is void for fraud in the execution, however, the issue will be decided by the arbitrator if the allegedly defrauded party "had a reasonable opportunity to discover the real terms of the contract." (*Rosenthal*, 14 Cal.4th at pp. 419–420.) Our Supreme Court has explained: "California law . . . requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had 'reasonable opportunity to know of the character or essential terms of the proposed contract.' [Citation.] If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution. [Citation.] [¶] It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." (*Id.* at p. 423.)

In the present case, Curt stated in his declaration that Faye did not give him sufficient time to read the MOU and represented that it was not a binding agreement. Even were we

19

to credit these statements, however, they would not establish fraud in the execution of the agreement to arbitrate. Whatever Faye's representations about the MOU, the MOU was, on its face, a binding agreement: It stated that upon execution by the parties, it "shall be in full force and effect and shall constitute the full understanding of the Parties that shall not be modified by any other agreements, oral or written." Curt's alleged failure to acquaint himself with these terms was unreasonable—and thus these terms are binding on SinoType—absent evidence that Faye "took some action or said something to hurry or pressure" him. (*Rosenthal*, *supra*, 14 Cal.4th at p. 424, fn. 12.) Curt does not assert that Faye did so: While he says that he had only 10 minutes to review the MOU, he admits this was because he had a flight to catch, not because Faye hurried him. Faye's statements, therefore, did not deprive Curt of a reasonable opportunity to discover the "the character and essential terms of the" MOU. (See *id.* at p. 424.) As a result, the MOU was not void under the doctrine of fraud in the execution, and the trial court therefore did not lack personal jurisdiction over SinoType.

SinoType also asserts the MOU was void because "there was a complete failure to give . . . consideration." We do not agree. A contract is illusory and void when one party assumes no obligations or provides no legal consideration. (*Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 385.) Consideration is "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled . . . ." (Civ. Code, § 1605.) In the present case, the MOU imposed mutual obligations on the parties: It provided that SinoType and Rockefeller Asia would each contribute 100 percent of their interests in their own companies to a "new

20

company," in which SinoType would receive an 87.5 percent interest, and Rockefeller Asia would receive a 12.5 percent interest.  On its face, therefore, the MOU reflects consideration to be given by both parties.  The MOU thus is not illusory or void for lack of mutuality or consideration.

SinoType asserts, finally, that the MOU is not enforceable because its language is vague and the waiver of formal service was not clearly labeled.  SinoType cites no authority for the proposition that this contention, even if meritorious, would have the effect of voiding the MOU.  Thus, the contention is forfeited.  (See *Rubio v. CIA Wheel Group* (2021) 63 Cal.App.5th 82, 94–95, 104 [plaintiff's failure to develop claim with reasoned legal argument and supporting authority forfeits the issue]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [same].)

In short, even were we to fully credit Curt's declaration, we still could not conclude that the MOU was void.  As a result, Rockefeller Asia's claims were properly submitted to the arbitrator, and the trial court had jurisdiction to enter judgment on the arbitration award.  The trial court therefore properly denied the untimely motion to vacate the judgment.

## DISPOSITION

The order denying the motion to set aside the judgment is affirmed. Respondent is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.                    KALRA, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.